MATTHEW T. SUMMERS, State Bar No. 280496
MSummers@chwlaw.us
CARMEN A. BROCK, State Bar No. 162592
CBrock@chwlaw.us
**COLANTUONO, HIGHSMITH & WHATLEY, PC**
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109
Telephone: (213) 542-5700
Facsimile: (213) 542-5710

Attorneys for Plaintiff

City of Ojai

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DISTRICT

| | |
|---|---|
| CITY OF OJAI, | **CASE NO.: _____** |
| Plaintiff, | Assigned to the Hon. Judge |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| UNITED STATES FOREST SERVICE; KARINA MEDINA, District Ranger, United States Forest Service; TOM VILSACK, Secretary of Agriculture, United States Department of Agriculture; and UNITED STATES FISH AND WILDLIFE SERVICE, | **(National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*; Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*; Endangered Species Act, 16 U.S.C. § 1531 *et seq.*; National Forest Management Act, 16 U.S.C. § 1604; Healthy Forest Restoration Act, 16 U.S.C. §§ 6591b & 6591d; and The Roadless Area Conservation Rule, 36 C.F.R. §§ 294.12 & 294.13)** |
| Defendants. | |
| | Filing Date: Trial Date: Discovery Cut-off: Motion Cut-off: |

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as a defendant), and 5 U.S.C. §§

280583.5
281253.v1

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**Colantuono, Highsmith & Whatley, PC**
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

701-706 (Administrative Procedure Act). The federal statutes and rules at issue in this case include the National Environmental Policy Act ("NEPA"; 42 U.S.C. §§ 4321-4370h), the Endangered Species Act ("ESA"; 16 U.S.C. § 1536), the Healthy Forest Restoration Act ("HFRA"; 16 U.S.C. §§ 6591b & 6591d), the Roadless Area Conservation Rule ("Roadless Rule"; Roadless Area Conservation Final Rule, 66 Fed. Reg. 3,244 (Jan. 12, 2001) (to be codified in 36 C.F.R. pt. 294),[1] and the National Forest Management Act ("NFMA"; 16 U.S.C. § 1604). This Court has authority to grant the requested relief pursuant to 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief) and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).

2.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(e)(1) because the City is located in this District, Defendants reside in this District, and a substantial part of the events or omissions giving rise to the City's claims occurred in this District. The City  is located in Ventura County, California, and this case challenges approval of a logging project located in Ventura County, California.

## INTRODUCTION

3.      The City challenges the United States Forest Service's authorization of the Reyes Peak Forest Health and Fuels Reduction Project ("Reyes Peak Project" or "Project") located on Pine Mountain in the Los Padres National Forest. The Project will involve logging and mastication of more than 750 acres of public land, including in the Sespe-Frazier Inventoried Roadless Area ("IRA"). The Forest Service intends to log thousands of trees in the Project area, including an unlimited number of old-growth trees as large as sixty-four inches in diameter. Furthermore, the agency plans to masticate old-growth chaparral, a shrub dominated ecosystem that is native to the area

---

[1] The Roadless Rule appears in the 2001-2004 editions of the Code of Federal Regulations, at 36 C.F.R. §§ 294.10-14. In 2005, it was replaced by the State Petitions Rule. 70 Fed. Reg. 25,654 (May 13, 2005). When that replacement was set aside the following year, the Roadless Rule was reinstated. *California ex rel. Lockyer v. USDA*, 459 F. Supp. 2d 874 (N.D. Cal. 2006), *aff'd*, 575 F.3d 999 (9th Cir. 2009)). However, the General Printing Office has thus far not conformed the current published Code accordingly. This complaint includes citations to 36 C.F.R. part 294.

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1  and is important for wildlife. Mastication means a tractor-like machine is used to chop

2  the chaparral into small chips.

3      4.     Reyes Peak is one of the most biologically-diverse hotspots in the Los

4  Padres National Forest. Pine Mountain hosts the greatest diversity of coniferous tree

5  species in Ventura County, which occur next to large expanses of rare old-growth

6  chaparral. Moreover, Reyes Peak contains the only "sky island" near Santa Barbara or

7  Los Angeles, meaning it provides unique habitat to higher-elevation species that cannot

8  survive in the nearby lowland regions. The Reyes Peak and Pine Mountain ridgeline

9  form the northern rim of the Sespe watershed, at over 7,000 feet elevation. The ridge is

10  home to over 400 species of native plants, including dozens that are rare or sensitive. It

11  is also home to an abundance of wildlife including the endangered California condor,

12  California spotted owl, northern goshawk, and several sensitive bat species.

13      5.     The Reyes Peak Project is also located entirely within ancestral lands of

14  the Chumash people, and Pine Mountain (known by its traditional name of "Opnow"),

15  is a sacred peak that is significant to the spiritual and religious beliefs of the Chumash.

16  The Project area contains culturally significant sites, as well as items like grinding

17  bowls and medicinal plants that could be destroyed by the Project. Tribal members also

18  visit Pine Mountain and Reyes Peak for prayer and ceremony, and the Project would

19  permanently alter the landscape where they pray.

20      6.     The Forest Service violated the National Environmental Policy Act

21  ("NEPA") when approving the Reyes Peak Project. The agency wrongly relied on

22  categorical exclusions ("CEs") instead of conducting an environmental assessment

23  ("EA") or environmental impact statement ("EIS"), thereby short-circuiting public

24  involvement and the consideration of alternatives. This matters because alternatives to

25  the Project could have avoided harm to the wild character of the Project area and the

26  cultural sites it contains.

27      7.     Moreover, the Forest Service ignored the requirements of the categorical

28  exclusions that were relied upon. All Forest Service "categorical exclusions," which are

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

1   found at 36 C.F.R. § 220.6 (2020), require what is called "scoping." 36 C.F.R.

2   § 220.4(e) (2020); 36 C.F.R. § 220.6(c) (2020). Scoping is how the Forest Service

3   ensures that the public is provided notice of, and the ability to comment on, any Forest

4   Service project. Here, the Forest Service did not state in its scoping letter that the agency

5   intended to rely upon the categorical exclusion found at 36 C.F.R. § 220.6(e)(6) (2020),

6   and consequently the public was not properly notified that the agency would be using

7   that particular CE. The Forest Service is therefore in violation of its own regulations

8   and cannot proceed under 36 C.F.R. § 220.6(e)(6) (2020).

9       8.    Furthermore, 36 C.F.R. § 220.6(e)(6) (2020) cannot be used for this

10  Project because 36 C.F.R. § 220.6(e)(6) (2020) does not authorize commercial thinning.

11  It also does not authorize the logging of large trees that contain dwarf mistletoe, or the

12  removal of snags or downed wood.

13      9.    The Forest Service likewise ignored the requirements of the other

14  categorical exclusions it relied upon—16 U.S.C. §§ 6591b, 6591d. In order for the

15  Forest Service to utilize these HFRA statutory CEs, the agency must maximize the

16  retention of old-growth and large trees, consider the best available scientific

17  information, and develop and implement the Project using a collaborative process. Here,

18  the Forest Service wrongly authorized the logging of old-growth and large trees, ignored

19  the best available science with respect to maintaining the integrity of the area's forest

20  and chaparral ecosystem, failed to collaborate with local Native American tribes and

21  other community stakeholders when developing the Project, and violated the terms of

22  the Los Padres National Forest's Land Management Plan.

23      10.   An EA or EIS is also required here because NEPA regulations preclude

24  the use of CEs when there are "extraordinary circumstances" present. 36 C.F.R.

25  § 220.6(b), (c) (2020). "Extraordinary circumstances" exist here because the Project

26  may cause serious harm to local "resource conditions" including Native American

27  religious and cultural sites, rare wildlife, and a proposed wilderness area and the Sespe-

28  Frazier IRA. *Id*. To the degree that there is uncertainty regarding impacts to these

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

1  resources, further analysis is required under NEPA. Forest Service Handbook
2  1909.15.31.2 ("If the degree of potential effect raises uncertainty over its significance,
3  then an extraordinary circumstance exists, precluding use of a categorical exclusion.").

4       11.    Wildlife impacts were also wrongly ignored under the ESA. The Project
5  area is home to the endangered California condor, which uses large trees for roosting.
6  The United States Fish and Wildlife Service ("FWS"), when concluding that the Project
7  would "not likely adversely affect" condors or their critical habitat, asserted that "[o]ne
8  of the project goals is to retain larger trees throughout the project area." FWS ESA
9  Section 7 Consultation Concurrence Letter ("FWS Concurrence") at 5. The Project, as
10  approved, however, allows large trees (up to sixty-four inches in diameter) that contain
11  dwarf mistletoe to be logged, and places no limit on the amount of such trees that can
12  be cut and removed. It was therefore not possible for the FWS to ensure that the Project
13  would not adversely affect important condor roosting trees.

14       12.    In addition, the Sespe-Frazier IRA is protected by the Roadless Rule. This
15  Rule forbids logging in any IRA except in very limited circumstances, such as the
16  logging of small diameter trees. 36 C.F.R. § 294.13 (2005). Here, the Forest Service
17  violated the Roadless Rule by authorizing the unlimited logging of trees up to sixty-
18  four inches in diameter in the Sespe-Frazier IRA, thereby failing to protect the IRA's
19  wild character.

20       13.    Moreover, the Project violates NFMA, which requires that projects in
21  National Forests be consistent with the Forest's Land Management Plan ("Forest Plan").
22  16 U.S.C. § 1604(i). The Reyes Peak Project contravenes the Forest Plan for the Los
23  Padres National Forest because the removal of trees and shrubs from the Project area
24  fails to protect the area's "High Scenic Integrity" and its "undeveloped character and
25  natural appearance." *See e.g.,* Los Padres National Forest Plan, Part 3, Standards 9 and
26  10. In addition, the Project does not adhere to the Forest Plan's findings regarding
27  safeguarding communities from wildfire because the Project is not located within the
28  defense zone or threat zone of the wildland urban interface ("WUI"). *See e.g.,* Los

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Padres National Forest Plan, Part 3, Standard 7.

14.    Finally, the HFRA provisions at issue in this case (16 U.S.C. §§ 6591b, 6591d), in order to ensure agency accountability, require annual reports containing "a description of all acres (or other appropriate unit) treated through projects carried out under [these CEs]." 16 U.S.C. § 6591b(g). As far as the City is aware, not a single annual report has yet been prepared or submitted as HFRA requires.

15.    The City's present and future interests in and use of the Reyes Peak Project area are and will be directly and adversely affected by the challenged decision. Those adverse effects include but are not limited to: (1) impacts to native plants and wildlife and their habitats within and around the Project area; (2) reduction and impairment of recreational opportunities; (3) impaired aesthetic value of forest lands, trails, and landscapes; and (4) loss of scientific study and viewing opportunities. In addition, the City has an interest in ensuring that Defendants comply with all applicable laws, regulations, and procedures pertaining to the management of national forest lands.

16.    Because Defendants' actions approving the Project violate the law, a declaration of rights and appropriate injunctive remedy issued by this Court will redress the actual and imminent injury to the City.

17.    The City brings this case seeking the Court's declaration that: the Forest Service violated, separately, or collectively, NEPA, the Roadless Area Conservation Rule, NFMA, HFRA, and the APA when approving the Reyes Peak Project; the FWS violated the ESA and APA when it concluded the Project is not likely to adversely affect California condors or their critical habitat; and the Forest Service and Tom Vilsack, Secretary of Agriculture, violated the HFRA and the APA by failing to issue annual reports pertaining to the use of CEs as required by HFRA. The City seeks to have this Court declare unlawful, vacate, and set aside the Forest Service's Decision approving the Reyes Peak Project and the FWS's decision that the Reyes Peak Project is not likely to adversely affect California condors or their critical habitat. The City also seeks injunctive relief as a provisional and permanent remedy Defendants' violations.

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1

**PARTIES**

18.     The City is a general law city organized under the Constitution and laws of the State of California and is located in Ventura County, California.

19.     Defendant UNITED STATES FOREST SERVICE is a federal government agency within the Department of Agriculture, which holds the National Forests in trust for the American people and is responsible for actions in the Reyes Peak Project area.

20.     Defendant KARINA MEDINA is a District Ranger for the Los Padres National Forest and signed the Decision Memo approving the Reyes Peak Project on September 30, 2021. She is included in this action in her official capacity.

21.     Defendant TOM VILSACK is the Secretary of Agriculture within the United States Department of Agriculture and is charged with responsibilities under HFRA. He is included in this action in his official capacity.

22.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE is the federal agency within the Department of Interior charged with responsibility for conserving endangered and threatened species under the Endangered Species Act, for enforcing and implementing the ESA, and for complying with the APA in connection with the Service's ESA actions.

**LEGAL FRAMEWORK**

**THE ADMINISTRATIVE PROCEDURE ACT ("APA")**

23.     The APA allows persons and organizations to challenge final agency actions in the federal courts. 5 U.S.C. §§ 702, 704.

24.     The APA declares that a court shall hold unlawful and set aside agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

**THE NATIONAL ENVIRONMENTAL POLICY ACT ("NEPA")**

25.     Congress enacted NEPA, 42 U.S.C. §§ 4321-4370h, to, among other things, "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "that will prevent or eliminate damage

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

to the environment." *Id.* § 4321. NEPA requires federal agencies to analyze and disclose to the public the environmental impacts of their actions. *Id.* § 4332(2)(C).

26.   To this end, the Council on Environmental Quality ("CEQ") has promulgated regulations implementing NEPA. Among other things, the regulations are intended to "tell federal agencies what they must do to comply with the procedures and achieve the goal of [NEPA]," to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken," and to ensure "better decisions" and "foster excellent action." 40 C.F.R. § 1500.1(a)-(c) (1978).[2] Moreover, "[a]ccurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.*

27.   NEPA and its implementing regulations promulgated by the CEQ require federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. §4332(2)(C).

28.   If an agency is unsure whether a proposed action may have significant environmental effects, it may prepare a shorter document called an "environmental assessment" ("EA") to determine if the proposed action will have significant environmental effects and whether an EIS is necessary. 40 C.F.R. §1501.4(c) (1978).

29.   When conducting environmental analysis pursuant to an EA or EIS, an agency must consider alternatives to the proposed action. *See, e.g.,* 40 C.F.R. § 1508.9(b) (1978).

30.   In narrow situations, neither an EA nor an EIS is required, and federal agencies may invoke a "categorical exclusion" ("CE") from NEPA. 40 C.F.R.

---

[2] Scoping for the Reyes Peak Project began on May 27, 2020. On July 16, 2020, the Council on Environmental Quality issued new NEPA regulations at 40 C.F.R. Part 1500, replacing previous regulations from 1978. *See* 85 Fed. Reg. 43304 (July 16, 2020) (*available at* https://www.federalregister.gov/documents/2020/07/16/2020-15179/update-to-the-regulations-implementing-the-procedural-provisions-of-the-national-environmental). The new NEPA regulations specifically provide that they "apply to any NEPA processes begun after September 14, 2020." 40 C.F.R. § 1506.13. Because the NEPA process for this matter began before September 14, 2020, and because the agency relied on the 1978 regulations when approving the Project, the 1978 regulations apply here.

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

§1501.4(a) (1978).

31.    A "categorical exclusion" is defined as "a category of actions that the agency has determined, in its agency NEPA procedures (§1507.3 of this chapter), normally do not have a significant effect on the human environment." 40 C.F.R. §1508.4 (1978). The Forest Service's established CEs can be found at 36 C.F.R. § 220.6 (2020).

32.    Here, the Forest Service relies in part on 36 C.F.R. § 220.6(e)(6) (2020), which applies to "[t]imber stand … improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction." 36 C.F.R. § 220.6(e)(6) (2020). "Examples include but are not limited to: (i) Girdling trees to create snags; (ii) Thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand; (iii) Prescribed burning to control understory hardwoods in stands of southern pine; and (iv) Prescribed burning to reduce natural fuel build-up and improve plant vigor." *Id*. "Timber stand improvement" is defined in the Forest Service Manual to only include the following practices: "1. Release and weeding. 2. Precommercial thinning. 3. Pruning. 4. Control of understory vegetation. 5. Fertilization. 6. Animal damage control." Forest Service Manual, Chapter 2470.

33.    If a project appropriately falls under an adopted CE, the agency generally need not prepare further analysis. *California v. Norton*, 311 F.3d 1162, 1175 (9th Cir. 2002). However, an agency adopting a categorical exclusion must "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." 40 C.F.R. 1508.4 (1978). If extraordinary circumstances are present, use of a categorical exclusion is improper. *Norton*, 311 F.3d at 1175.

34.    The Forest Service's regulations include a list of seven resource conditions that must be considered in determining whether "extraordinary circumstances" related to a proposed action make the use of a categorical exclusion inappropriate, and include

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

the following:

> (i) Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species;
> (ii) Flood plains, wetlands, or municipal watersheds;
> (iii) Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas;
> (iv) Inventoried roadless area or potential wilderness area;
> (v) Research natural areas;
> (vi) American Indians and Alaska Native religious or cultural sites; and
> (vii) Archaeological sites, or historic properties or areas.

36 C.F.R. § 220.6(b).

35.     If a "cause-effect" relationship between the proposed action and these resource conditions exists, it is the "degree of the potential effect of a proposed action on these resource conditions that determines whether extraordinary circumstances exist." 36 C.F.R. § 220.6.

36.     The Forest Service's Handbook provides: "If the degree of potential effect raises uncertainty over its significance, then an extraordinary circumstance exists, precluding use of a categorical exclusion." Forest Service Handbook 1909.15.31.2.

37.     If there is substantial evidence in the record that exceptions "may apply," use of the categorical exclusion is prohibited. *Norton*, 311 F.3d at 1177.

38.     In addition, Forest Service regulations identify classes of actions that "normally" require preparation of an EIS, and these include "[p]roposals that would substantially alter the undeveloped character of an inventoried roadless area." 36 C.F.R. § 220.5(a)(2) (2020).

39.     The Forest Service's categorical exclusion regulations require "scoping" prior to the use of a CE. *See* 36 C.F.R. § 220.6(c) (2020) (determination of potential for significant effects must be "based on scoping"); 36 C.F.R. § 220.4 (2020) ("Scoping is required for all Forest Service proposed actions, including those that would appear to be categorically excluded from further analysis and documentation in an EA or an EIS (§ 220.6).)"

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

40. "Scoping" is the "early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action." 40 C.F.R. § 1501.7 (1978); *see also* 36 C.F.R. § 220.6(c) (2020). As discussed in the Forest Service Handbook, "scoping is important to discover information that could point to the need for an EA or EIS versus a CE." Forest Service Handbook §1909.15, Section 31.3.

41. If, "based on scoping, it is uncertain whether the proposed action may have a significant effect on the environment," the agency "must prepare an EA." 36 C.F.R. § 220.6(c) (2020). If "the proposed action may have a significant environmental effect," then the agency "must prepare an EIS." 36 C.F.R. § 220.6(c) (2020).

42. In addition to the Forest Service's regulatory CEs, Congress has created statutory NEPA "categorical exclusions" that the Forest Service may use. For purposes of this case, the statutory "categorical exclusions" can be found in HFRA at 16 U.S.C. §§ 6591b and 6591d.

43. When using 16 U.S.C. § 6591b or 16 U.S.C. § 6591d, the Forest Service must "maximize the retention of old-growth and large trees, as appropriate for the forest type, to the extent that the trees promote stands that are resilient to insects and disease," must "consider the best available scientific information to maintain or restore the [forest's] ecological integrity, including maintaining or restoring structure, function, composition, and connectivity," the project must be "developed and implemented through a collaborative process that includes multiple interested persons representing diverse interests and is transparent and nonexclusive, and the project must "be consistent with the land and resource management plan." 16 U.S.C. § 6591b; 16 U.S.C. § 6591d. Even if a project falls within a statutory CE, the presence of "extraordinary circumstances" can preclude use of the CE. 16 U.S.C. § 6591d(c)(4).

44. HFRA's statutory CEs also require "an annual report on the use of categorical exclusions under [6591b and 6591d] that includes a description of all acres (or other appropriate unit) treated through projects carried out under [these sections]."

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1

16 U.S.C. § 6591b(g); 16 U.S.C. § 6591d(g). To fulfill the legislature's oversight authority, HFRA requires the Forest Service to submit these annual reports to various Congressional committees as well as the Government Accountability Office. 16 U.S.C. § 6591b(g)(2).

## THE ENDANGERED SPECIES ACT ("ESA")

45.     Section 7 of the ESA requires each federal agency, in consultation with the FWS, to ensure that any action authorized, funded, or carried out by the agency is not likely to (1) jeopardize the continued existence of any threatened or endangered species or (2) result in the destruction or adverse modification of the critical habitat of such species. 16 U.S.C. § 1536(a)(2).

46.     If listed or proposed species may be present in the project area, the federal agency must prepare a "biological assessment" to determine whether the listed species may be affected by the proposed action. 50 C.F.R. § 402.12 (1986) .

47.     If the agency determines that its proposed action may affect any listed species or critical habitat, the agency must normally engage in "formal consultation" with the FWS. 50 C.F.R. § 402.14 (2019). However, an agency need not initiate formal consultation if, as a result of the preparation of a biological assessment or as a result of informal consultation with the FWS, the agency determines, with the written concurrence of the FWS, that the proposed action is not likely to adversely affect any listed species or critical habitat. *Id*.

48.     If the FWS concludes that the proposed action "will jeopardize the continued existence" of a listed species, a "biological opinion" must outline "reasonable and prudent alternatives." 16 U.S.C. § 1536(b)(3)(A). If the biological opinion concludes that the action is not likely to jeopardize the continued existence of a listed species, and will not result in the destruction or adverse modification of critical habitat, the FWS must provide an "incidental take statement," specifying the amount or extent of such incidental taking on the species, any "reasonable and prudent measures" that the FWS considers necessary or appropriate to minimize such impact, and setting forth

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

the "terms and conditions" that must be complied with by the agency to implement those measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14 (i) (2019).

49. In fulfilling its obligation to ensure that its actions do not jeopardize the continued existence of any endangered species or destroy or adversely modify its critical habitat, the federal agency is required to use the best scientific and commercial data available. 16 U.S.C. § 1536(a)(2).

## THE ROADLESS AREA CONSERVATION RULE ("ROADLESS RULE")

50. Inventoried roadless areas "comprise only 2% of the land base in the continental United States," but "provide many social and ecological benefits." 66 Fed. Reg. at 3,245. For example, these remnant undeveloped areas "provide clean drinking water and function as biological strongholds for populations of threatened and endangered species, . . . provide large, relatively undisturbed landscapes that are important to biological diversity and the long-term survival of many at-risk species . . . [and] provide opportunities for dispersed outdoor recreation, opportunities that diminish as open space and natural settings are developed elsewhere." *Id*.

51. In 2001, in order "to protect and conserve inventoried roadless areas on National Forest System lands," the Forest Service established the Roadless Area Conservation Rule. Roadless Area Conservation Final Rule, 66 Fed. Reg. 3,244 (Jan. 12, 2001). To achieve its intent, the Roadless Rule "prohibits road construction, reconstruction, and timber harvest in inventoried roadless areas because [these activities] have the greatest likelihood of altering and fragmenting landscapes, resulting in immediate, long-term loss of roadless area values and characteristics." *Id.*

52. The Forest Service may, however, approve logging "infrequent[ly]" in inventoried roadless areas if the agency determines that certain circumstances exist, including the following:

> (1) The cutting, sale, or removal of *generally small diameter timber* is needed for one of the following purposes and will maintain or improve one or more of the roadless area characteristics as defined in § 294.11.

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

(i) To improve threatened, endangered, proposed, or sensitive species habitat; or

(ii) To maintain or restore the characteristics of ecosystem composition and structure, such as to reduce the risk of uncharacteristic wildfire effects, within the range of variability that would be expected to occur under natural disturbance regimes of the current climatic period.

36 C.F.R. § 294.13 (2005) (emphasis added).

53.    Roadless area characteristics as defined in § 294.11 are as follows: (1) High quality or undisturbed soil, water, and air; (2) Sources of public drinking water; (3) Diversity of plant and animal communities; (4) Habitat for threatened, endangered, proposed, candidate, and sensitive species and for those species dependent on large, undisturbed areas of land; (5) Primitive, semi-primitive nonmotorized and semi-primitive motorized classes of dispersed recreation; (6) Reference landscapes; (7) Natural appearing landscapes with high scenic quality; (8) Traditional cultural properties and sacred sites; and (9) Other locally identified unique characteristics. 36 C.F.R. § 294.11 (2005).

## THE NATIONAL FOREST MANAGEMENT ACT ("NFMA")

54.    The National Forest Management Act directs the Forest Service to develop Land and Resource Management Plans ("Forest Plans") by which to manage each National Forest. 16 U.S.C. § 1604.

55.    The Forest Service implements a Forest Plan by approving or disapproving particular projects such as the Reyes Peak Project here. Proposed projects must be consistent with the Forest Plan. *Id*. at § 1604(i).

56.    A Project that is inconsistent with a Forest Plan cannot be approved using the statutory CEs under 16 U.S.C. §§ 6591b and 6591d.

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

# FACTUAL BACKGROUND

## A.     Reyes Peak Project Collaboration and Scoping Process

57.     On May 27, 2020, the Forest Service proposed the Reyes Peak Project in the Los Padres National Forest by issuing a scoping letter and associated Project proposal. Forest Service Scoping Letter for Reyes Peak Project, May 27, 2020, ("Scoping Letter"); Forest Service Project Proposal for Reyes Peak Project, May 8, 2020 ("Project Proposal").

58.     The Forest Service did not collaborate with the City or other environmental, local government, or community stakeholders when developing the Reyes Peak Project prior to scoping. The City and a majority of community stakeholders, including local Native American tribes, conservation groups, academics, scientists, industry groups, and local property owners, were not invited to assist with preparation of the Project and were not notified of the Project until scoping was announced.

59.     By that time, the Forest Service had already delineated the Project boundary, developed the Project description and design, determined the Project purpose, and need, and chosen to proceed via categorical exclusion rather than an EA or EIS.

60.     The Forest Service scoping letter stated that the agency did not plan to conduct an EA or EIS for the Project because the agency believed the Project "falls within two categories of actions that do not require documentation in an Environmental Assessment or an Environmental Impact Statement: Categories statutorily established by Congress: Section 603 of HFRA (16 U.S.C. 6591b), Insect and Disease Infestation; Section 605 of HFRA (16 U.S.C. 6591d), Wildfire Resilience." Scoping Letter at 2.

61.     The scoping letter did not speak to any other categorical exclusions under NEPA.

62.     The Project Proposal document stated that the Forest Service planned to conduct vegetation treatments, such as commercial thinning of trees and mastication of

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

281253.v1

1  chaparral, on approximately 755 acres of the Los Padres National Forest, including

2  within the Sespe-Frazier IRA. Project Proposal at 1.

3  63.    The Project was proposed in the wake of former President Trump's

4  December 2018 Executive Order (13855), which directed the Forest Service to sell 3.8

5  billion board feet of timber. An internal memo sent to Regional Foresters from the

6  agency's Acting Deputy Chief on May 30, 2019, and another internal memo sent from

7  the Acting Deputy Chief on June 5, 2019, indicate that the Project may be intended to

8  meet timber logging quotas with minimal environmental review. The May 2019 memo

9  also encouraged Forest Service officials to invoke categorical exclusions as "the first

10 choice and used whenever possible" and encouraged the agency to "explore creative

11 methods" to exclude actions like the Reyes Peak Project from environmental review.

## B.    Scoping Comment Letters and Project Impacts

14 64.    The Forest Service received an outpouring of public opposition to the

15 Project, with roughly 16,000 comments submitted on the Project and over ninety-nine

16 percent in opposition.

17 65.    On August 5, 2021, the City submitted comments to the Forest Service in

18 opposition to the Project. A true and correct copy of the City's August 5, 2021 letter is

19 attached hereto as **Exhibit "1"** and is incorporated fully by this reference. The letter

20 emphasized that Mt. Pinos is a critical recreational location for Ojai residents who

21 routinely visit the area for hiking, family camping, birdwatching, and photography. Mt.

22 Pinos also provides direct economic benefit to Ojai's business center from travelers

23 stopping on their way to Mt. Pinos. The City requested the Forest Service reconsider

24 the elimination of 1,600 trees in this area. The area  is a critical  spiritual center for local

25 Indigenous Tribes, as well as  home to several sensitive plants and animals. The City

26 recommended promoting defensible space requirements near homes rather than logging

27 old growth trees as a form of wildfire protection, particularly since  scientific studies

28 demonstrate remote vegetation treatment is an ineffective way to protect communities

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1  from extreme weather wildfires in California.

2       66.    The City sent the same letter to the Forest Service again on September 1,

3  2021, to emphasize the City's opposition to the Project. A true and correct copy of the

4  City's September 1, 2021 letter is attached hereto as **Exhibit "2"** and is incorporated

5  herein fully by this reference.

6       67.    After no response from the Forest Service to its letters, the City sought

7  support from Assemblymember Steve Bennett in opposition to the Project. A true and

8  correct copy of the City's October 13, 2021 letter to Assemblymember Bennett is

9  attached hereto as **Exhibit "3"** and is incorporated herein fully by this reference. The

10  letter voiced the City Council's unanimous opposition to the Project for the reasons set

11  forth in the City's August 5, 2021, and September 1, 2021, letters to the Forest Service.

12       68.    The City also reached out to State Senator Monique Limon for District 19.

13  A true and correct copy of the City's October 13, 2021 letter to Senator Limon is

14  attached hereto as **Exhibit "4"** and is incorporated herein fully by this reference. Like

15  all the other requests for support, the letter to Senator Limon voiced the City Council's

16  unanimous and unwavering opposition to the Project.

17       69.    The City additionally sought support from Congresswoman Julia

18  Brownley. A true and correct copy of the City's October 13, 2021 letter to

19  Congresswoman Brownley is attached hereto as **Exhibit "5"** and is incorporated herein

20  fully by this reference. Th letter again voiced the City Council's unanimous opposition

21  to the Project for the all the reasons set forth in the City's August 5, 2021, and

22  September 1, 2021, letters to the Forest Service.

23       70.    The City likewise sought support from U.S. Senator Dianne Feinstein. A

24  true and correct copy of the City's October 13, 2021 letter to Senator Feinstein is

25  attached hereto as **Exhibit "6"** and is incorporated herein fully by this reference. The

26  letter to Senator Feinstein echoed the same information provided to State legislators

27  and, again, emphasized the City Council's unanimous opposition to the Project.

28       71.    At the same time, the City reached out to U.S. Senator Alex Padilla

*Colantuono, Highsmith & Whatley, PC*
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1

requesting his support. A true and correct copy of the City's October 13, 2021, letter to Senator Padilla is attached hereto as **Exhibit "7"** and is incorporated herein fully by this reference.

72.     Many other individuals and entities submitted comments in opposition to the Project including: former Ojai Mayor Johnny Johnston, Ventura County Supervisor Linda Parks and former Supervisor and current State Assemblyman Steve Bennett, State Senator Hannah-Beth Jackson, Congressmembers Julia Brownley and Salud Carbajal, leaders from local Native American groups, the California Department of Fish and Wildlife, Los Padres ForestWatch, Keep Sespe Wild Committee, The American Alpine Club, Earth Island Institute, Patagonia Works, Center for Biological Diversity, and nearly 100 local businesses and 70 environmental organizations.

73.     Comment letters submitted by agencies and academics, discussed at length how the Project would harm the forest, wildlife, cultural sites, and the Sespe-Frazier IRA. *See, e.g.*, Los Padres ForestWatch, Center for Biological Diversity, John Muir Project of Earth Island Institute, Wishtoyo Chumash Foundation, and California Chaparral Institute, Scoping Comments on Reyes Peak Project, August 14, 2020 ("LPFW, *et al*. Comments"); Patagonia Scoping Comments on Reyes Peak Project, August 4, 2020 ("Patagonia Comments"); Keep Sespe Wild Committee Scoping Comments on Reyes Peak Project, August 13, 2020 ("KSWC Comments"); Environmental Groups Sign On Letter Scoping Comments on Reyes Peak Project including Los Padres ForestWatch, the Center for Biological Diversity, and the American Alpine Club, among others, August 14, 2020. These impacts are described below.

## 1. Impacts to Ecosystem Health

74.     Because the Project would authorize the logging of any tree up to 24 inches in diameter, as well as any tree up to 64 inches in diameter if it contains dwarf mistletoe, Comments submitted in opposition of the Project discussed the harm this could cause to forest health and ecosystem integrity. For example, the forests on Pine Mountain

**Colantuono, Highsmith & Whatley, PC**
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

naturally contain dwarf mistletoe, a native parasitic plant that grows primarily on Jeffrey pines in the area. Bennetts et al. (1996) found that the presence of dwarf mistletoe is associated with increased avian diversity and is necessary for "healthy diverse forest ecosystems." LPFW, *et al*. Comments at 6. Moreover, Hanson and Odion (2016) found that trees approaching 24 inches in diameter are often old-growth (i.e., 100 - 200 years old or more). *Id*. at 5.

75.     Because the Project Proposal asserted the Project is needed to prevent tree mortality from bark beetles and wildfire, opposition comments explained that it is likely that many more trees would be killed and removed from the forest by the Project than would ever succumb to bark beetles or fire. LPFW, *et al*. Comments at 13. It further explained that trees killed by bark beetles and fire remain in the forest and are themselves important for forest health because dead trees provide habitat for countless species from woodpeckers to fungi. *Id*. at 78. Dead trees also eventually fall and become downed woody debris, which not only decomposes over time and recycles nutrients, but also provides important habitat for chipmunks and other small rodents, lizards and salamanders, insects, and more. *Id*. at 47, 69.

76.     Not only would the Project remove numerous trees, but it would also likewise destroy old-growth chaparral, a native shrub dominated ecosystem that provides critical wildlife habitat. Decision Memo at 15.  Opposition comments pointed out that the Forest Service failed to properly classify the relationship between chaparral and wildfire in the Project area. LPFW, *et al*. Comments at 17-18. Specifically, chaparral has evolved to burn at high-severity, and the Forest Service even acknowledges this reality when it states: "Being prone to infrequent large, high intensity wildfires is the natural condition of chaparral (California Chaparral Institute)." Project Proposal at 5. Yet the agency then classified most of the chaparral-dominated area within the Project area as Fire Regime Group I (i.e., frequent low or mixed severity wildfire) or III (i.e., infrequent low or mixed severity wildfire), when in fact chaparral falls under the definition of Fire Regime Group IV (i.e., infrequent high-severity

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
281253.v1

wildfire). Areas that fall under Fire Regime Group I or III can qualify for the CEs found at 16 U.S.C. 6591b and 16 U.S.C. 6591d, whereas areas under Fire Regime Group IV cannot. *See* 16 U.S.C. § 6591b(c)(2)(B); 16 U.S.C. § 6591d(c)(2)(B).

77.     The Forest Service also misstated a number of facts regarding the forest conditions in the Project area. For example, the methods and the data used by the agency show an average number of trees per acre of 80.5, whereas the Decision Memo asserts there are 100 trees per acre currently. Decision Memo at 5. Moreover, the data shows there are fewer trees in the Project Area today as compared to 1930. LPFW, *et al*. Comments at 34. The Forest Service based its decision to log the Project area on these wrongful assumptions.

## 2. Impacts to Cultural Resources

78.     The Project area is located entirely within ancestral lands of the Chumash people and is a culturally significant area to the Chumash Peoples. Archeologists' Group Comment Letter on Reyes Peak Project, August 14, 2020 ("Archeologists' Comments") at 2; Coastal Band of the Chumash Nation Comments on Reyes Peak Project, August 14, 2020 ("Coastal Band Chumash Comments") at 1; Wishtoyo Chumash Foundation Comment Letter on Reyes Peak Project, August 14 2020 ("Wishtoyo Comments") at 1.

79.     Pine Mountain Ridge and Reyes Peak are among the highest promontories in Chumash territory and are saturated with extraordinary cultural significance. Barbareño/Ventureño Band of Mission Indians, August 9, 2020 ("BVBMI") Comment Letter at 2. Moreover, Pine Mountain is a sacred peak that is significant to the spiritual and religious beliefs of the Ventureño Chumash. Archeologists' Comments at 3.

80.     Several Native American Tribes submitted comments in opposition to the Project and identified the presence of valuable cultural and religious resources in the Project area that would be significantly impacted by the Project. For example, the Coastal Band of Chumash Nation identified grinding bowls and medicinal plants that

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

would be destroyed by the Project. Coastal Band Chumash Comments at 1. Their tribal members also visit Pine Mountain and Reyes Peak for prayer and ceremony, and the Project would permanently alter landscape where they pray. *Id*. at 2.

81.     The Forest Service itself acknowledges that cultural sites are likely present in the Reyes Peak Project area. In the 2015 Forest Service's Strategic Fuel Break Assessment for the four ranger districts in the southern Los Padres National Forest (p. 235), the agency states that cultural values (sites) are present within 300 feet and 1000 feet of a hypothetical fuel break stretching along the ridgeline from Hwy 33 to Reyes Peak. It is therefore likely that cultural sites exist within the Project area and could be negatively impacted.

82.     "Cultural sites" include former village sites, work sites, sacred sites, petroglyph and arborglyph sites, and burials of human remains and associated cultural materials. These sites are of great cultural importance to Chumash Peoples and must be protected regardless of the level of previous disturbance or environmental degradation of the area.

83.     Cultural sites also include traditional gathering sites for ceremonial plants, medicine plants, food plants, basketry plants, and other material culture plants. Wishtoyo Comments at 2. Traditional gathering sites are irreplaceable and not interchangeable with other locations that have the same plant species. Traditional gathering sites have unique features that make the plants grow in a manner appropriate for their traditional uses and have often been intentionally and carefully tended by Chumash families for generations. *Id*.

84.     Unlike archaeological sites, which can be identified from previous archaeological documentation, cultural sites can only be identified through consultation with Chumash tribes, bands, clans, and family groups. Wishtoyo Comments at 2. This information is generally closely held by culture bearers and under normal circumstances is not shared with the public, academia, or agencies. *Id*. Exceptions, under confidential conditions, can be made in order to protect these natural cultural resources. *Id*.

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
281253.v1

85.     There are several Chumash tribes, bands, clans, and family groups associated with the Project area. Wishtoyo Comments at 2. These tribal entities are not interchangeable and culture bearers in each tribal group hold unique traditional knowledge relevant to cultural sites in the project area. *Id.*

86.     The City is informed and believes the Forest Service did not consult with several of the local Chumash tribes, bands, clans and family groups to identify cultural resources on the Project site.

87.     The Project does not include Chumash monitors on site necessary to identify and prevent cultural resources from being significantly affected by the Project's logging and mastication activities.

### 3. Impacts to Wildlife and Plant Species

88.     The Project would authorize the logging of live trees up to twenty-four inches in diameter, and live trees up to sixty-four inches in diameter if they contain dwarf mistletoe. This tree removal will have significant adverse impacts on all bird species in the Project area that rely on these trees for habitat needs, including the California condor (*Gymnogyps californianus*), California spotted owl (*Strix occidentalis occidentalis*, "CSO"), and northern goshawk (*Accipiter gentilis*). Nowhere in the Forest Service's Decision Memo does the agency indicate that any kind of numeric limitation will be set as to how many large trees may be removed. Many large trees in the Project area contain some amount of dwarf mistletoe and thus might be removed. Therefore, the unlimited removal of large trees may degrade important habitat for these bird species.

89.     In addition, the Project would authorize the unlimited removal of snags (i.e., dead trees) and downed material, if deemed a hazard. While the Decision Memo states that "an effort would be made to retain large snags" there is nothing in the Decision Memo to ensure their retention because an "exception" is "allowed in wildland-urban interface defense zones, fuel breaks, and where [snags] pose a safety hazard." Decision Memo at 37. This exception also applies to downed logs and therefore

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

1   the Project may remove *all* dead and downed material from forested treatment areas,

2   without limitation. *See, e.g.,* Reyes Peak Project Biological Assessment at 21

3   ("Implementation of the proposed action would remove most dead and down materials,

4   including snags. Although an effort would be made to retain large snags, safety at the

5   discretion of the operator, may preclude retention of snags."); Forest Service Reyes

6   Peak Forest Health and Fuels Reduction Project Wildlife Biological Evaluation,

7   September 28, 2021 ("Wildlife BE") at 15 ("Although most dead and down materials

8   would be removed, an effort would be made to retain large snags.") Bird species,

9   including California condors, California spotted owls, and northern goshawks, all rely

10  on this material for habitat needs, and thus will be adversely affected by the Project. For

11  example, the Wildlife BE states with respect to goshawks: "As a result [of removing

12  dead and down material], refugia and escape cover for prey species may be limited to

13  stands adjacent to the project area and individuals within the project area may be

14  displaced, injured, or killed." *Id.*

15      90.    Dead or dying trees and large trees are precisely the types of trees on which

16  condors depend for roosting and perching. LPFW, *et al*. Comments at 42-43.

17  Specifically, "Dead conifers are preferred to living trees. Dead trees have no foliage to

18  obstruct flight or visibility or to catch the wind and cause the branches to sway." Koford,

19  C.B. 1953. *The California Condor*, Dover Publications, Inc. New York. The Forest

20  Service's species account for the California condor highlights the importance of

21  roosting and perching habitat: "Condors often return to traditional sites for perching and

22  resting. Traditional roost sites include cliffs and large trees and snags (roost trees are

23  often conifer snags 40-70 feet tall), often near feeding and nesting areas…" U.S. Forest

24  Service. 2005. Species account for the California condor.[3]

25

26  _____

27  [3] A "Species Account" is a document the Forest Service prepares to evaluate the biology and status of sensitive animal and plant species that occur in a national forest, and to provide specific science-based guidance on how to reduce threats and conserve

28  sensitive species. The Species Accounts are expressly incorporated by reference into the Land Management Plan for the Los Padres National Forest in Appendix H ("When planning projects or managing ongoing activities in areas that contain habitat for species of concern (including threatened, endangered, proposed, candidate, and

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

91.     The Project will also involve thinning to reduce canopy cover and basal area per acre. Opening up the canopy in or immediately adjacent to suitable condor roosting trees will make the area more susceptible to wind, which can adversely impact roosting. LPFW, *et al*. Comments at 43. In addition, condor roosting sites are particularly susceptible to human disturbance, and even human presence.

92.     The Project Area contains suitable habitat for the CSO, which is a Forest Service sensitive species (and management indicator species) for the Los Padres National Forest. CSOs rely on large trees for nesting and roosting, and large trees also help ensure the dense canopy cover in which CSO prefer to live. The Forest Service species account for the CSO highlights their need for complex habitat including "A mature overstory with average [diameter at breast height ("dbh")] exceeding 24 inches. . .[and] A densely stocked stand with basal areas averaging in excess of 190 ft2, with none less than 160 ft2." Forest Service. 2005. Species Account—California Spotted Owl.

93.     Current research indicates that fuel treatments may negatively impact CSOs. A study in 2014 examining the effects of establishing a network of fuel breaks on various species including the California spotted owl found, in response to fuel treatments, "the number of California spotted owl territories declined. The effects on owls could have been mitigated by increasing the spatial heterogeneity of fuel treatments." Stephens, S.L., S.W. Bigelow, R.D. Burnett, B.M. Collins, C.V. Gallagher, et al. 2014. California spotted owl, songbird, and small mammal responses to landscape fuel treatments. *BioScience*, 64(10): 893-906.

---

sensitive species and other species identified by biologists as being in danger of population decline or habitat loss) use the information found in various types of species guidance documents to develop project-specific design criteria. Species guidance documents include…species accounts prepared for this planning effort or subsequent to it.") and are referenced in specific plan standards (*see, e.g.*, S28: "Avoid or minimize disturbance to breeding and roosting California condors by prohibiting or restricting management activities and human uses within 1.5 miles of active California condor nest sites and within 0.5 miles of active roosts. Refer to California condor species account (or subsequent species guidance document; see Appendix H) for additional guidance.").

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

94.     The Forest Service completed the *Conservation Strategy for the California Spotted Owl* (Strix occidentalis occidentalis) *on the National Forests of Southern California* in 2004, which includes guidelines for fuels management activities outside of the WUI Defense or Threat Zones on national forest land characterized by pine and mixed conifer forest. Forest Service. 2004. Conservation Strategy for the California Spotted Owl (*Strix occidentalis occidentalis*) on the National Forests of Southern California. The Project does not align with the CSO Conservation Strategy for several reasons. First, trees greater than twenty-four inches dbh within CSO's "Home Range Cores" could be removed, contrary to the guidelines specifications that such trees be retained unless they are at "unnaturally high densities." *Id.* Additionally, the Decision Memo indicates that ten to fifteen hard snags will be retained per five acres or about two to three per acre on average—significantly less than the guidelines recommended four to eight per acre. *Id.* Yet, as explained above, even that low amount would not be enforced because of the safety exception allowing for unlimited removal of dead and downed material. Moreover, the Project does not include any measures to retain woodrat nests in the Project Area, contrary to the guidelines which specify to "retain all woodrat nests in spotted owl habitat; avoid disturbing/destroying them." *Id.*

95.     Moreover, the Project would reduce the stands to between sixty and 100 ft2 basal area per acre—well below the basal area per acre needed by CSO (i.e. > 160 ft2 basal area per acre). LPFW, *et al*. Comments at 46.

96.     Further, medium-sized trees that will be logged are important to spotted owls because they help maintain the basal area, canopy cover and structural complexity that the owls prefer. As the Forest Service acknowledges, the Project could have used a diameter limit of twelve inches and still met its fire objectives because "[m]odeling indicates that thinning treatments of trees at 12, 20, and 30 in. dbh could yield a similar reduction of burn probability (Collins et al. 2011b), so removal of smaller trees, rather than larger ones important to CSO habitat, should be prioritized." Decision Memo at 9.

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

97.     The Project may also impact the northern goshawk (*Accipiter gentilis*), a Forest Service sensitive species and CDFW species of special concern. The species' year-round range includes Pine Mountain and the surrounding area according to the CDFW's species account. Keane, J.J. 2008. Northern goshawk (*Accipiter gentilis*). Shuford, W.D. and T. Gardali, eds. In "California Bird Species of Special Concern: A ranked assessment of species, subspecies, and distinct populations of birds of immediate conservation concern in California." *Studies of Western Birds*, 1:156-162. Overall, there are 225 acres of predicted suitable habitat for the northern goshawk within the Project Area (or about 30%). LPFW, *et al*. Comments at 47. Goshawks exhibit a preference for high canopy closure and a high density of larger trees, and large snags and downed logs are also important components of goshawk habitat. *Id*. For example, according to the Forest Service's species account prepared with the 2005 Forest Plan, "Large snags and downed logs are believed to be important components of northern goshawk foraging habitat because such features increase the abundance of major prey species (Reynolds and others 1992)." U.S. Forest Service. 2005. Species Account—Northern goshawk. The northern goshawk will therefore be adversely affected by the unlimited removal of large trees and dead or downed material, because they rely on these resources for habitat needs.

98.     Several bat species likely occur within the Project area and are likely to be adversely affected, including the fringed myotis and pallid bat. Specifically, these bat species roost during the day in large trees and snags. As CDFW explained in their Comments: "Bats in southern California can be active year-round, however, all potential breeding species are most active between March 15 and September 15. Each bat species has unique habitat needs, such as specific gap size of cracks and seasonality. Direct impacts via habitat removal, noise, percussive vibration, human disturbance, and direct take would reasonably occur during the Project." CDFW Comments at 13. The Wildlife BE likewise provides: "Relative to taking no action, in which snags, hollows, crevices, and exfoliating bark to roost may be created or enhanced by fire (Blakey et al.

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1

2019), these types of structures [for bats] would largely be removed from the 755-acre project area." Wildlife BE at 21. Therefore, bats will be adversely affected by the Project.

99.    At least five sensitive plant species occur within or near the Project Area according to records in the California Natural Diversity Database and the California Consortium of Herbaria. These include: *Acanthoscyphus parishii* var abramsii (Abrams' spineflower); *Monardella linoides* ssp. *oblonga* (Tehachapi or flax-like monardella); *Sidotheca caryophylloides* (chickweed oxytheca); *Layia heterotricha* (pale yellow layia), and *Delphinium parryi* ssp. *purpureum* (Mt. Pinos larkspur). Los Padres ForestWatch's comments included a figure with observation locations for these species near the Project Area (Figure 15). LPFW, *et al.* Comments at 48.

100.    All of these species will be adversely affected by the Project. For example, chickweed oxytheca may be the species most vulnerable to the Project's impacts. The agency's species account states: "The primary threat to this species habitat is fuels and vegetation management that will occur across most of this species habitat during the Plan period." U.S. Forest Service. 2012. Chickweed oxytheca. Species Account. The agency has also provided that the Abrams' spineflower "has the potential to be impacted by chipping or placement of other organic material following fuel treatments." U.S. Forest Service. 2012. Abrams' spineflower. Species Account.

### 4. Impacts to Sespe-Frazer IRA and Potential Wilderness Area

101.    Prior to the Project being proposed, the U.S. House of Representatives approved two pieces of legislation that would designate approximately thirty-four percent of the Project area as additions to the Sespe Wilderness. This bill—introduced by local Congress members Salud Carbajal and Julia Brownley—is currently awaiting action in the Senate. Yet, the Forest Service failed to disclose that the Project area included a potential wilderness area. Decision Memo at 23. Logging is not permitted in

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1

Wilderness areas, yet the Forest Service nonetheless approved logging within this potential Wilderness.

102.   Moreover, the area that may soon become Wilderness is currently part of the existing, mapped Sespe-Frazier IRA. The CEQ NEPA regulations specify that "[p]roposals that would substantially alter the undeveloped character of an inventoried roadless area" normally require the preparation of an EIS. 36 C.F.R. § 220.5(a)(2) (2008). Furthermore, the Roadless Rule prohibits logging in inventoried roadless areas unless the logging is limited to "generally small diameter trees." 36 C.F.R. § 294.13(b)(1) (2005).

103.   The Project alters 311 acres of the Sespe-Frazier IRA by removing a substantial portion of the trees and shrubs currently present. The Project also authorizes the logging of an unlimited number of large trees that contain dwarf mistletoe in this roadless area, up to sixty-four inches in diameter.

## 5. Wildfire Risk

104.   The Project authorizes the mastication of hundreds of acres of chaparral. Opposition comments discussed how this action can increase, rather than decrease, wildfire risk. Specifically, it can lead to an increase in non-native, invasive plant occurrence in the area, particularly *B. tectorum*, which creates a more ignition-prone landscape with an increased rate of fire spread.

105.   Professor Carla M. D'Antonio, University of California, Santa Barbara, commented on this issue as well, stating: "The creation of fuel break is known to result in non-native species invasions (Merriam et al. 2006, Potts and Stephens 2009) especially by non-native annual grasses which can increase fire occurrence and frequency (D'Antonio and Vitousek 1992, Fusco et al. 2019)." Carla M. D'Antonio, University of California, Santa Barbara Environmental Studies Program, Comments on Reyes Peak Project, August 14, 2020 ("D'Antonio Comments").

106.   This concern is not limited to chaparral-dominated areas. Keeley (2006) states in regard to fuel reduction projects in forests: "There is growing evidence that

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

281253.v1

these fuel reduction projects alter ecosystem structure in ways that promote alien plant invasion…. Restoration includes restoring not only natural processes such as fire but also natural structure through mechanical thinning of forests, and these practices also may enhance alien invasion. Extensive forest restoration is currently underway in many western U.S. ponderosa pine forests. These treatments alone or in combination with burning of slash increase both the diversity and abundance of alien plant species…"

## C.    Inconsistencies with Land Management Plan

107.    Scoping comments explained the loss of trees and shrubs in the Project area would also violate the Forest Plan for the Los Padres National Forest. For example, much of the Project area is designated by the Forest Plan as "Back Country Non-Motorized" zone. The Forest Plan states that "the management intent is to typically retain the undeveloped character and natural appearance of [this] zone" and further states that fuelbreaks are "not generally compatible" with this zone. Los Padres National Forest Plan, Part 2, at 5, 8. Similarly, the Forest Plan requires that projects be designed to "meet the [Plan's] Scenic Integrity Objectives (SIOs)." Los Padres National Forest Plan, Part 3, at Standards 9 and 10. The Reyes Peak Project would occur in an area designated as "High Scenic Integrity," which is defined as "conditions where human activities are not visually evident" and the "landscape appears unaltered." Los Padres National Forest Plan, Part 3, at 98.

108.    The Forest Plan also explains that "there are extensive areas within and adjacent to the national forests of southern California meeting the definition of Wildland/Urban Interface (WUI)," which is a distance "up to 1.5 miles from communities at risk or as defined in individual community fire protection plans." Los Padres National Forest Plan, Part 3, at Standard 7. The Reyes Peak Project is located far outside the WUI because the Project is much farther than 1.25 miles from the Defense Zone of any community and is outside the Threat Zone as defined in the local Mt. Pinos Community Wildfire Protection Plan.[4]

---

[4] Not only is the Project not part of the Mt. Pinos CWPP, the Ventura County Fire Plan

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

109.    Vegetation removal on Pine Mountain ranks very low on the Forest Service's own priority list. Specifically, in a 2015 assessment, officials listed the Reyes Peak project as priority number 118 out of 163 projects. The project received a "Values at Risk" score of three out of a possible twenty-eight, and a wildland-urban interface (WUI) score of zero.

110.    Comments submitted by the California Department of Fish and Wildlife ("CDFW") also address this issue, explaining:

> While fuel modifications in the form of defensible space have proven to be an effective method to defend infrastructure (Keeley et al. 2019, Syphard et al., 2014), the project is located in a remote area outside of the urban wildlife interface approximately 3 miles from the nearest community. . . . Additionally, these fire breaks provide vehicular and human access into areas that may have been inaccessible to humans prior to the fire break, thus creating secondary impacts such as renegade trails, trash, illegal collecting of wildlife (e.g., amphibians, reptiles, raptors), poaching, and degradation of areas that were previously pristine wilderness.

CDFW Comments on Reyes Peak Project Scoping, August 14, 2020 ("CDFW Comments") at 4. CDFW's comments encouraged "exploring project alternatives such as creation of defensible space or strategically placed fuel breaks within the urban wildlife interface that may provide communities more protection and reduce the impacts to high quality habitat in relatively undisturbed remote areas." *Id*. at 5.

## D.    Decision Memo and Project Approval

111.    Despite widespread opposition, on October 4, 2021, the Forest Service issued its Decision Memo approving the Reyes Peak Project. The Memo states: "This project is categorically excluded from documentation in an environmental impact statement or an environmental assessment because it fits into the following categories: 1. 36 CFR 220.6(e)(6) (2020) timber stand and/or wildlife habitat improvement

likewise does not include the Reyes Peak Project. The Decision Memo states that the Project falls under the Ventura County Fire Plan, but the Project was only added to the Ventura County Fire Plan after scoping for the Project began, and the Project has since been removed from the Ventura County Fire Plan.

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1

activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction. 2. Healthy Forest Restoration Act Section 602 (16 U.S.C. 6591c) and Section 603 (16 U.S.C. 6591b). The Insect and Disease and Wildfire Resilience categories of exclusion applies to all acres within condition Class II and III, which is approximately 88 percent of the project (666 acres)." Decision Memo at 18.

112.   The Decision Memo contains no explanation to justify the use of 36 C.F.R. § 220.6(e)(6) (2020). The language and history of this CE show that it cannot be used for commercial thinning, the logging of large trees that contain dwarf mistletoe, or the removal of snags or downed wood. This CE only authorizes precommercial thinning, which is a prescription for removing small trees under 6 to 8 inches dbh, whereas the Project authorizes the unlimited logging of trees up to 64 inches in diameter.

113.   The Decision Memo identifies several resource conditions that exist on the Project site, but concludes that the Project does not present extraordinary circumstances. Decision Memo at 19-27. The Forest Service, however, ignored important information and used an improper standard (e.g., requiring "a loss of species viability" or "a trend toward Federal listing" with respect to Project impacts to wildlife). Decision Memo at 20, 21; *see also, e.g.,* Wildlife BE at 15 (emphasis in original) (concluding the Project "***may impact individuals but is not likely to result in a loss of species viability in the planning area, nor cause a trend toward federal listing*** of northern goshawk").

114.   For example, the Memo asserts that "[b]ased on discussions with federally recognized tribes and agency research and analysis, there are no Native American religious or cultural sites within the project area." Decision Memo at 27. No analysis or information is presented, however, to substantiate this conclusion, and it contradicts the comments submitted by local tribes, as well as the Forest Service's own findings.

115.   In addition, the Decision Memo ignores or inadequately addresses adverse impacts to wildlife and plant species. Decision Memo at 19-23. For example, it fails to address the potential for numerous large trees to be logged due to the Project's authorization, without limit, of logging of large trees with dwarf mistletoe. It also fails

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

to address the potentially unlimited removal of snags and dead or down material. These actions will adversely impact federally-listed and Forest Service sensitive species including California condors, the CSO, northern goshawk, and two bat species.

116.   The Decision Memo also acknowledges that the Project "will result in [California spotted owl] nesting habitat being changed over to foraging habitat," which is significant given the ongoing decline of the California spotted owl population, and the importance of large trees and snags to the species. Decision Memo at 21.[5]

117.   The Decision Memo concludes that federally-listed and Forest Service sensitive plant species are not present in the Project Area based on surveys conducted in 2018 revealing no occurrence of such species. Decision Memo at 23. Accordingly, the Decision Memo summarily concludes that there is no likely effect on any such plant species. *Id.* However, the Botany Report on which the Decision Memo relies provides zero information regarding these surveys, other than that they were conducted "throughout the project area in the summer of 2018," making it impossible to evaluate their methodological sufficiency, and even includes some information that calls the surveys into question. Forest Service Reyes Peak Forest Health and Fuels Reduction Project Botanical Biological Assessment, Biological Evaluation, and Non-Native Invasive Species Risk Assessment ("Botany Report") at 4.

118.   For example, the Botany Report recognizes that "several occurrences" of at least one plant species, the chickweed oxytheca (also known as chickweed starry puncturebract), across the eastern portion of the Project Area, are in the Consortium of California Herbaria Portal as recently as 2011. Botany Report at 4. This occurrence is also cited in the LPFW, *et al*. comment letter. LPFW, *et al*. Comments at 49, 96 (Figure 15). The California Native Plant Society likewise commented that this species has been

---

[5] The Decision Memo also states that "in November 2019, the U.S. Fish and Wildlife Service issued a finding that it is not warranted at this time to list the California spotted owl as endangered or threatened." However, that November 2019 finding was challenged in federal court, and the U.S. Fish and Wildlife Service settled the case, agreeing to issue a new finding by February of 2023.

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

documented within the Project boundary and several more are likely to occur. California Native Plant Society, Reyes Peak Project Scoping Comments, August 14, 2020 ("CNPS Comments") at 2-3. The Botany Report also states that there will be additional surveys conducted before project implementation because the species is very small and flowers in late summer. Botany Report at 4. The need for additional surveys undermines the validity of relying on existing surveys to conclusively determine there are no impacts. Moreover, the same surveys were conducted for non-native species, and they failed to include observations of a highly abundant species—cheatgrass (Bromus tectorum), which calls into question the veracity of the survey methodology. Botany Report at 5.

119.   Further, when addressing Project impacts to the Sespe-Frazier IRA, the Decision Memo fails to acknowledge that logging, especially that of large trees, could substantially alter the undeveloped character of the IRA. Decision Memo at 23-27. The Decision Memo also fails to address that the impacted area is part of current legislation that, if passed, would designate the area as Wilderness, and thus off-limits to logging. *Id.* at 23.

120.   The Decision Memo also includes contradictory statements regarding impacts to large trees. For example, the Memo, at Table 7, states that zero trees over 24 inches in diameter would be removed by the Project, Decision Memo at 25, yet elsewhere the Memo states that trees up to 64 inches in diameter can be removed if the tree contains dwarf mistletoe. Decision Memo at 14. The Memo offers no information or analysis at all regarding how many trees in the Project area contain dwarf mistletoe, or how many of them will be removed. The City is informed and believes many large trees in the Project area contain dwarf mistletoe and thus might be removed.

**E.    Endangered Species Act Consultation**

121.   On May 27, 2021, the Forest Service issued a Biological Assessment concluding that California condors are "not likely to be adversely affected" by the Project, and the FWS concurred with that determination in a letter dated August 27, 2021.

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
281253.v1

122.   The FWS concurrence, however, fails to acknowledge or address the potential for numerous large trees to be logged due to the Project's authorization, without limit, of logging of large trees with dwarf mistletoe, or the unlimited removal of snags.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### National Environmental Policy Act Violations: Failure to Scope the Reyes Peak Project's Reliance on 36 C.F.R. § 220.6(e)(6) (2020)

123.   The allegations in each paragraph above are incorporated herein by reference.

124.   All Forest Service "categorical exclusions," which are found at 36 C.F.R. § 220.6, (2020) require what is called "scoping." 36 C.F.R. § 220.4(e) (2020) ("Scoping is required for all Forest Service proposed actions, including those that would appear to be categorically excluded from further analysis and documentation in an EA or an EIS (§ 220.6."). Scoping is defined as the "early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action." 40 C.F.R. § 1501.7 (1978).

125.   Here, on May 27, 2020, the Los Padres National Forest initiated the scoping process for the Reyes Peak project by issuing to the public a letter and associated project proposal. The Forest Service scoping letter, however, nowhere stated that the agency intended to rely upon the categorical exclusion found at 36 C.F.R. § 220.6(e)(6) (2020), and instead the letter stated that the agency intended to rely upon the categorical exclusions found at 16 U.S.C. § 6591b and 16 U.S.C. § 6591d.

126.   On October 4, 2021, the Forest Service issued its Decision Memo approving the Reyes Peak Project. The Decision Memo is the first time the Forest Service formally stated that it would be relying upon the categorical exclusion found at 36 C.F.R. § 220.6(e)(6) (2020) to justify the Project.

127.   Because the Forest Service did not state in its scoping letter that the agency

1    intended to rely upon the categorical exclusion found at 36 C.F.R. § 220.6(e)(6) (2020),

2    the public was not properly notified that the agency would be using that particular CE.

3        128.   Because the Forest Service failed to scope its reliance on 36 C.F.R.

4    § 220.6(e)(6) (2020), the agency is in violation of its own regulations and cannot

5    proceed under 36 C.F.R. § 220.6(e)(6) (2020), and the adoption of the Decision Memo

6    was, therefore, arbitrary, capricious, an abuse of discretion, or otherwise not in

7    accordance with law under the APA, 5 U.S.C. § 706(2)(A).

8

9                         **SECOND CAUSE OF ACTION**

10   **National Environmental Policy Act Violations: Wrongful Reliance on
       36 C.F.R. § 220.6(e)(6) (2020)**

11       129.   The allegations in all previous paragraphs are incorporated herein by

12   reference.

13       130.   The categorical exclusion found at 36 C.F.R. § 220.6(e)(6) (2020) states

14   that it can be used for the following: "Timber stand and/or wildlife habitat improvement

15   activities that do not include the use of herbicides or do not require more than 1 mile of

16   low standard road construction. Examples include, but are not limited to: (i) Girdling

17   trees to create snags; (ii) Thinning or brush control to improve growth or to reduce fire

18   hazard including the opening of an existing road to a dense timber stand; (iii) Prescribed

19   burning to control understory hardwoods in stands of southern pine; and (iv) Prescribed

20   burning to reduce natural fuel build-up and improve plant vigor."

21       131.   The history and context of 36 C.F.R. § 220.6(e)(6) (2020) shows that it can

22   only be used for precommercial thinning, not commercial thinning.

23       132.   Further, the language of this CE shows that it cannot be used to log large

24   trees with dwarf mistletoe, nor does it authorize the unlimited removal of dead or

25   downed material. Such activities do not constitute "Timber stand improvement." 36

26   C.F.R. § 220.6(e)(6) (2020); Forest Service Manual (defining "timber stand

27   improvement" to include the following practices: "1. Release and weeding. 2.

28   Precommercial thinning. 3. Pruning. 4. Control of understory vegetation. 5.

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1

Fertilization. 6. Animal damage control").

133. Because the Reyes Peak Project authorizes commercial thinning, as well as the logging of large trees with dwarf mistletoe, it cannot rely on the CE at 36 C.F.R. § 220.6(e)(6) (2020), and the adoption of the Decision Memo was, therefore, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2)(A).

# THIRD CAUSE OF ACTION

## National Environmental Policy Act and HFRA Violations: Wrongful Reliance on 16 U.S.C. §§ 6591b, 6591d

134. The allegations in all previous paragraphs are incorporated herein by reference.

135. In addition to 36 C.F.R. § 220.6(e)(6) (2020), the Decision Memo for the Reyes Peak Project relies upon the statutory categorical exclusions found at 16 U.S.C. § 6591b and 16 U.S.C. § 6591d.

136. In order for the Forest Service to utilize these statutory CEs, the agency must maximize the retention of old-growth and large trees, consider the best available scientific information, develop and implement the project at issue using a collaborative process, and be consistent with the applicable Forest Plan. 16 U.S.C. §§ 6591b, 6591d. Further, a project must either be "in the wildland-urban interface," or "in Fire Regime Groups I, II, or III, outside the wildland-urban interface."

137. Further, NEPA requires that the Forest Service ensure scientific accuracy and integrity in NEPA documents, and must clearly divulge its methodologies for key findings, and present hard data upon which those findings are based.

138. Here, the Forest Service violated those requirements. The agency wrongly authorized the logging of large/old-growth trees by allowing trees as large as twenty-four inches in diameter to generally be logged, and allowing trees as large as sixty-four inches in diameter to be cut if the trees contain any amount of dwarf mistletoe. The agency likewise ignored the best available science with respect to maintaining the

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1

integrity of the area's forest and chaparral ecosystem. The best available science shows that the logging of medium and large sized trees can be antithetical to making the forest more resilient to wildfire. This is because medium and large sized trees are fire-resistant and should therefore be maintained, not logged. Further, the best available science shows that chaparral ecosystems, especially the old-growth, should not be masticated in order to maintain the integrity of the ecosystem. The project area is entirely outside of the wildland-urban interface and much of the Project area is not within Fire Regime Group I, II, or III. Finally, the Project is not consistent with the Los Padres Forest Plan, as described below in the Eighth Cause of Action.

139.  Opposition comments also presented scientific evidence and analysis showing that the Forest Service: (1) overstates current average timber stand densities; and (2) makes erroneous comparisons between current and historic stand densities. If the Forest Service decides to proceed with an action in the absence of an EA or EIS, it must adequately explain its decision and must do so with scientific accuracy and integrity, clearly divulging its methodologies, and presenting the data upon which the agency's findings are based. Here, Defendants failed to properly address the concerns raised and failed to adequately explain its Decision.

140.  Because the Forest Service violated the requirements of 16 U.S.C. § 6591b, 16 U.S.C. § 6591d, and NEPA when it approved the Reyes Peak Project, the adoption of the Decision Memo was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2)(A).

## FOURTH CAUSE OF ACTION

### Failure to Prepare an EA or EIS Despite the Presence of Extraordinary Circumstances in Violation of NEPA

141.  The allegations in each paragraph above are incorporated herein by reference.

142.  NEPA requires federal agencies, including the Forest Service, to complete an EA or an EIS, and to consider reasonable alternatives, before approving any major

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

proposed federal action, unless the proposed action falls under a "categorical exclusion". *See* 40 C.F.R. § 1508.18, 1508.9, 1508.11, 1508.4 (1978). However, even when a Forest Service project meets the definition of a particular categorical exclusion, an EA or EIS is nonetheless still required if "extraordinary circumstances" exist due to the project's localized impacts. 36 C.F.R. § 220.6(b) (2020).

143. "Extraordinary circumstances" are determined based on the presence of, and analysis of impacts to, the following "resource conditions" at issue in this case:

> "(i) Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species;…(iv) Inventoried roadless area or potential wilderness area;…(vi) American Indians and Alaska Native religious or cultural sites."

144. It is "the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions that determines whether extraordinary circumstances exist." 36 C.F.R. § 220.6(b)(2) (2020). If the agency determines that it is uncertain whether the proposed action may have a significant effect on the environment, the agency must prepare an EA. 36 C.F.R. § 220.6(c) (2020); *see also* Forest Service Handbook 1909.15.31.2 ("If the degree of potential effect raises uncertainty over its significance, then an extraordinary circumstance exists, precluding use of a categorical exclusion.").

145. The Forest Service Decision Memo does not provide a rational explanation of why the Project's potential impacts to resource conditions are insignificant. The Project adversely affects several resource conditions such that extraordinary circumstances exist and reliance on a categorical exclusion is improper.

146. Specifically, the Project will destroy or damage numerous cultural sites, yet the Forest Service concluded there are no cultural sites in the Project area.

147. In addition, the Project will have significant adverse impacts on the federally-listed California condor; Forest Service sensitive animal species, including the CSO, northern goshawk, fringed myotis, and pallid bat; and Forest Service sensitive

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

plant species including Abrams' spineflower, Tehachapi or flax-like monardella, chickweed oxytheca, pale yellow layia, and Mt. Pinos larkspur.

148.   Finally, the Project will scar the Sespe-Frazier IRA and a potential wilderness area by removing numerous trees and shrubs. Moreover, Forest Service regulations identify classes of actions that "normally" require preparation of an EIS, and these include "[p]roposals that would substantially alter the undeveloped character of an inventoried roadless area." 36 C.F.R. § 220.5(a)(2) (2008), which is the case here because logging and mastication unequivocally will degrade the Project area's character.

149.   For the above reasons, the proposed action's effect on resource conditions is such that extraordinary circumstances exist and the Forest Service's assessment of extraordinary circumstances, and its failure to complete an EA or an EIS before approving the Reyes Peak Project, violates NEPA and was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of the APA, 5 U.S.C. § 706(2)(A).

## FIFTH CAUSE OF ACTION
### Failure to Prepare an EIS in Violation of NEPA

150.   The allegations in each paragraph above are incorporated herein by reference.

151.   NEPA requires all federal agencies to prepare an EIS for all major federal actions significantly affecting the quality of the human environment.  42 U.S.C. § 4332(C). The Forest Service violated NEPA in approving the Reyes Peak Project without preparing an EIS because many of the factors requiring the preparation of an EIS (40 C.F.R. § 1508.27 (1978)) are triggered by the Forest Service's approval of the Reyes Peak Project, including  "[u]nique characteristics of the geographic area such as proximity to park lands . . . wetlands . . . or ecologically critical areas," "the degree to which the effects on the quality of the human environment are likely to be highly controversial," "the degree to which the possible effects on the human environment are

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
281253.v1

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

highly uncertain or involve unique or unknown risks," "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration," and "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." *Id.* § 1508.27(b). The presence of any one of these factors may be sufficient to require preparation of an EIS. *See Nat'l Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722, 731 (9th Cir. 2001); *Norton*, 311 F.3d at 1162.

152.   Therefore, the Forest Service's approval of the Reyes Peak Project without first preparing an EIS was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2)(A).

## SIXTH CAUSE OF ACTION

### Endangered Species Act Violation: Arbitrary and Capricious "Not Likely to Adversely Affect" Determination

153.   The allegations in each paragraph above are incorporated herein by reference.

154.   On August 27, 2021, the FWS issued a letter to the Forest Service stating that the agency concurred with the Forest Service's determination that the Project is "not likely to adversely affect" the endangered California condor or their critical habitat.

155.   Both the Forest Service and the FWS, in making their "not likely to adversely affect" conclusions, appear to assume that only a very small number of large trees will be logged in the Project area. The Project, as approved, however, authorizes an unlimited number of large trees that contain any amount of dwarf mistletoe, as well as an unlimited number of snags, to be logged. Nowhere does the Forest Service state the number of large trees or snags within the Project area that could fall under this authorization. Consequently, it was not possible for the FWS to reasonably conclude that such logging would not adversely affect condors or their critical habitat in light of the best available science showing the importance of large trees and snags to condors.

156.   The FWS's "not likely to adversely affect" concurrence was not based on

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1  the best scientific and commercial data available as required by the ESA, 16 U.S.C. §

2  1536(a)(2), and was, therefore, arbitrary and capricious, an abuse of discretion, or

3  otherwise not in accordance with law under the APA. 5 U.S.C. § 706(2)(A).

### SEVENTH CAUSE OF ACTION

**Roadless Area Conservation Rule Violation: Failure to Comply with Requirement to Only Log "Generally Small Diameter Trees"**

7  157.  The allegations in each paragraph above are incorporated herein by

8  reference.

9  158.  The Roadless Area Conservation Rule generally prohibits road

10  construction and the cutting, sale, or removal of trees within identified "inventoried

11  roadless areas." 36 C.F.R. § 294.12(a) & 294.13(a), published in 66 Fed. Reg. 3244,

12  3272-73 (Jan. 12, 2001). However, the Forest Service may approve logging

13  "infrequent[ly]" in inventoried roadless areas if the agency determines that certain

14  narrow circumstances exist, including the following:

> (1) The cutting, sale, or removal of generally small diameter timber is needed for one of the following purposes and will maintain or improve one or more of the roadless area characteristics as defined in § 294.11.
> (i) To improve threatened, endangered, proposed, or sensitive species habitat; or
> (ii) To maintain or restore the characteristics of ecosystem composition and structure, such as to reduce the risk of uncharacteristic wildfire effects, within the range of variability that would be expected to occur under natural disturbance regimes of the current climatic period.

22  36 C.F.R. § 294.13 (2005).

23  159.  The Reyes Peak Project does not comply with the Roadless Rule's

24  mandates with respect to logging in the Sespe-Frazier IRA. Small diameter trees are

25  normally ten inches or less in diameter in the Los Padres National Forest, yet the Project

26  Decision Memo authorizes the logging of trees up to twenty-four inches in diameter

27  generally, and up to sixty-four inches in diameter when the trees contain dwarf

28  mistletoe.

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1

160. For the above reasons, the Forest Service violated the Roadless Area Conservation Rule in approving the Reyes Peak Project and its Decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2)(A).

## EIGHTH CAUSE OF ACTION

### National Forest Management Act and NEPA and HFRA Violations: Failure to Comply with the Forest Plan

161. The allegations in each paragraph above are incorporated herein by reference.

162. NFMA requires the creation of land and resource management plans ("Forest Plans") and requires projects within the Forest to follow the Forest Plan. Moreover, the statutory CEs under HFRA at issue in this case explicitly state that "projects and activities carried out under this section shall be consistent with the land and resource management plan." 16 U.S.C. § 6591b, 16 U.S.C. § 6591d.

163. Much of the Project area is designated by the Forest Plan as part of the "Back Country Non-Motorized" zone. The Forest Plan states that "the management intent is to retain the natural character of [this] zone" and further states that fuelbreaks are "not generally compatible" with this zone. The Reyes Peak Project violates this aspect of the Forest Plan because the Forest Service has failed to adequately explain how the Project is compatible with this zone or how the Project will retain the area's character despite the drastic reduction in trees and shrubs in the area.

164. The Forest Plan also requires that projects be designed to "meet the Scenic Integrity Objectives (SIOs)." The Reyes Peak Project would occur in an area designated as "High Scenic Integrity," which is defined as "conditions where human activities are not visually evident" and the "landscape appears unaltered." The Reyes Peak Project violates this requirement because the Forest Service has failed to adequately explain how the Project will ensure "High Scenic Integrity."

165. The Forest Plan explains that "there are extensive areas within and adjacent

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

281253.v1

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

1   to the national forests of southern California meeting the definition of Wildland/Urban

2   Interface (WUI)," defined as a distance "up to 1.5 miles from communities at risk or as

3   defined in individual community fire protection plans." The WUI consists of "a direct

4   protection buffer (WUI Defense Zone) and an indirect protection buffer (WUI Threat

5   Zone) that fall within the broader definition WUI."  "A WUI Defense Zone is the area

6   directly adjoining structures and evacuation routes," and the "Threat Zone generally

7   extends approximately 1.25 miles out from the Defense Zone boundary." The Reyes

8   Peak Project purports to be a community protection project, but it is located far outside

9   the WUI as defined in the Forest Plan (it is farther than 1.25 miles from the Defense

10  Zone of any community and is far outside the Threat Zone as described in the local Mt.

11  Pinos CWPP).

12      166.   For the above reasons, the Project violates the Forest Plan, and the Forest

13  Service therefore violated NFMA, 16 U.S.C. § 6591b, and 16 U.S.C. § 6591d, and its

14  actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

15  with law under the APA, 5 U.S.C. § 706(2)(A).

16

## NINTH CAUSE OF ACTION

### HFRA Violations: Failure to Prepare and Submit Annual Reports

18

19      167.   In order to ensure accountability, HFRA's statutory CEs state that "The

20  Secretary shall prepare an annual report on the use of categorical exclusions under this

21  section that includes a description of all acres (or other appropriate unit) treated through

22  projects carried out under this section." 16 U.S.C. § 6591b(g), and 16 U.S.C.
    § 6591d(g).

23      168.   These reports must be submitted by the Secretary "to the Committee on

24  Agriculture, Nutrition, and Forestry of the Senate; the Committee on Environment and

25  Public Works of the Senate; the Committee on Agriculture of the House of

26  Representatives; the Committee on Natural Resources of the House of Representatives;

27  and the Government Accountability Office." 16 U.S.C. § 6591b(g), and 16 U.S.C.

28  § 6591d(g).

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

169.   As far as the City is aware, not a single report has yet been prepared or submitted. Under 16 U.S.C. § 6591b, these reports were to be submitted "[n]ot later than 1 year after February 7, 2014, and each year thereafter." Under 16 U.S.C. § 6591d, these reports were to be submitted "[n]ot later than 1 year after March 23, 2018, and each year thereafter."

170.   For the above reasons, the Secretary of Agriculture and the Forest Service have violated 16 U.S.C. § 6591b and 16 U.S.C. § 6591d, and have unlawfully withheld or unreasonably delayed agency action under the APA, 5 U.S.C. § 706(1), and their actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or without observance of procedure required by law under the APA, 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

The City respectfully requests that this Court enter judgment in its favor and against Defendants and provide the following relief:

1.   Declare that Defendant the Forest Service violated NEPA, the Roadless Rule, NFMA, HFRA, and the APA in approving the Reyes Peak Project;

2.   Declare the Defendant FWS violated the ESA and APA by concluding the Project is not likely to adversely affect California condors and/or their critical habitat;

3.   Declare that Defendants the Forest Service and Tom Vilsack, Secretary of Agriculture, violated the HFRA and the APA by failing to issue annual reports pertaining to the use of CEs as required by HFRA;

4.   Declare unlawful, vacate, and set aside Defendant the Forest Service's Decision approving the Reyes Peak Project, and use of CEs;

5.   Declare unlawful, vacate, and set aside Defendant U.S. Fish and Wildlife Service's decision that the Reyes Peak Project is not likely to adversely affect California condors and/or their critical habitat;

6.   Grant the City such temporary restraining orders or preliminary or permanent injunctions as they may request, including ordering Defendants to comply

**Colantuono, Highsmith & Whatley, PC**
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1

1   with NEPA, the ESA, the Roadless Rule, NFMA, HFRA, and the APA;

2       7.      Enjoin implementation of the Reyes Peak Project pending compliance with

3   NEPA, the ESA, the Roadless Rule, NFMA, HFRA, and the APA;

4       8.      Award the City costs and reasonable attorneys' fees as authorized by the

5   Equal Access to Justice Act, 28 U.S.C. § 2412(d) and any other statute;

6       9.      Retain jurisdiction of this action to ensure compliance with its decree; and

7       10.     Any other relief as the Court deems just and proper.

8                                   **COLANTUONO, HIGHSMITH &**
                                    **WHATLEY, PC**
9

10

11                                  /s/ Carmen A. Brock
                                    **MATTHEW T. SUMMERS**
12                                  **CARMEN A. BROCK**
                                    Attorneys for Plaintiff
13                                  City of Ojai

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

# EXHIBIT "1"

**EXHIBIT "1"**
**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109



*OFFICE OF THE MAYOR*

*Betsy Stix*

*401 S. Ventura Street, Ojai, CA 93023*

August 5, 2021

United States Forest Service
Los Padres National Forest
Attn: Supervisor Kevin Elliot
1980 Old Mission Drive.
Solvang, CA 93464

RE: Opposition to the Mt. Pinos Logging Proposal

Dear Mr. Elliot,

The City of Ojai City Council opposes the logging of Mt. Pinos. While the logging will occur outside of Ojai city limits, Mt. Pinos is a special place for many Ojai residents. Many Ojai residents visit the area for hiking, family camping, birdwatching, and photography, and have a very close personal connection with the place.

In addition, Mt. Pinos provides a direct economic benefit to businesses in Ojai, as people who come to the area from throughout southern California stop in Ojai for food, gas, equipment, and lodging on their way to Mt. Pinos.

The City of Ojai opposes the logging proposal of Mt. Pinos and ask that the agency reconsider the proposal to cut down 1,600 acres of trees. Mt. Pinos is an important Chumash site in the Los Padres National Forest that lies at the physical and spiritual center of local Indigenous Tribes. The area is also popular for recreation and is home to several sensitive plants and animals.

We understand that the Forest Services has proposed this harvest as a form of community wildfire protection. However, several scientific studies have demonstrated that remote vegetation treatments are ineffective in protecting communities from fires that occur during extreme weather – which are conditions that cause the majority of damage in California. The City of Ojai would recommend promoting defensible space requirements near homes, rather than logging special and invaluable old growth forests of Mt. Pinos and Pine Mountain.

The City of Ojai supports the opposition to the Mt. Pinos logging proposal in accordance with the City of Ojai Legislative Platform adopted by the City Council, Environment Quality section, stating the City supports farmland and habitat preservation.

Thank you.

Sincerely,

*Betsy Stix*
Betsy Stix
Mayor, City of Ojai

**EXHIBIT "1"**
**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Colantuono, Highsmith & Whatley, PC**
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

# EXHIBIT "2"

**EXHIBIT "2"**
**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1



**OFFICE OF THE MAYOR**

*Betsy Stix*

*401 S. Ventura Street, Ojai, CA 93023*

September 1, 2021

United States Forest Service
Los Padres National Forest
Attn: Supervisor Kevin Elliot
1980 Old Mission Drive.
Solvang, CA 93463

RE: Opposition to the Mt. Pinos Logging Proposal

Dear Mr. Elliot,

The City of Ojai City Council opposes the logging of Mt. Pinos. While the logging will occur outside of Ojai city limits, Mt. Pinos is a special place for many Ojai residents. Many Ojai residents visit the area for hiking, family camping, birdwatching, and photography, and have a very close personal connection with the place.

In addition, Mt. Pinos provides a direct economic benefit to businesses in Ojai, as people who come to the area from throughout southern California stop in Ojai for food, gas, equipment, and lodging on their way to Mt. Pinos.

The City of Ojai opposes the logging proposal of Mt. Pinos and asks that the agency reconsider plans to remove a substantial number of trees and shrubs from 1,600 acres of habitat. Mt. Pinos is an important Chumash site in the Los Padres National Forest that lies at the physical and spiritual center of local Indigenous Tribes. The area is also popular for recreation and is home to several sensitive plants and animals.

We understand that the Forest Services has proposed this harvest as a form of community wildfire protection. However, several scientific studies have demonstrated that remote vegetation treatments are ineffective in protecting communities from fires that occur during extreme weather – which are conditions that cause the majority of damage in California. The City of Ojai would recommend promoting defensible space requirements near homes, rather than logging special and invaluable old growth forests of Mt. Pinos and Pine Mountain.

The City of Ojai supports the opposition to the Mt. Pinos logging proposal in accordance with the City of Ojai Legislative Platform adopted by the City Council, Environment Quality section, stating the City supports farmland and habitat preservation.

Thank you.

Sincerely,

Betsy Stix

Betsy Stix
Mayor, City of Ojai

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

**EXHIBIT "2"**
**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Colantuono, Highsmith & Whatley, PC**
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

# EXHIBIT "3"

**EXHIBIT "3"**
**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1



**OFFICE OF THE MAYOR**

**Betsy Stix**

*401 S. Ventura Street, Ojai, CA 93023*

October 13, 2021

Assemblymember Steve Bennett
State Capitol
P.O. Box 942849
Sacramento, CA 94249-0037

RE: Opposition to the Mt. Pinos Logging Proposal

Dear Assemblymember Bennett,

The City of Ojai City Council opposes the logging of Mt. Pinos. While the logging will occur outside of Ojai city limits, Mt. Pinos is a special place for many Ojai residents. Many Ojai residents visit the area for hiking, family camping, birdwatching, and photography, and have a very close personal connection with the place.

In addition, Mt. Pinos provides a direct economic benefit to businesses in Ojai, as people who come to the area from throughout southern California stop in Ojai for food, gas, equipment, and lodging on their way to Mt. Pinos.

The City of Ojai opposes the logging proposal of Mt. Pinos and asks that the agency reconsider plans to remove a substantial number of trees and shrubs from 1,600 acres of habitat. Mt. Pinos is an important Chumash site in the Los Padres National Forest that lies at the physical and spiritual center of local Indigenous Tribes. The area is also popular for recreation and is home to several sensitive plants and animals.

We understand that the Forest Services has proposed this harvest as a form of community wildfire protection. However, several scientific studies have demonstrated that remote vegetation treatments are ineffective in protecting communities from fires that occur during extreme weather – which are conditions that cause the majority of damage in California. The City of Ojai would recommend promoting defensible space requirements near homes, rather than logging special and invaluable old growth forests of Mt. Pinos and Pine Mountain.

On October 12, 2021, at the City of Ojai City Council meeting, the City Council unanimously voted to support the opposition to the Mt. Pinos and Pine Mountain logging projects.

Thank you.

Sincerely,

*Betsy Stix*

Betsy Stix
Mayor, City of Ojai

cc: Supervisor Kevin Elliot, Los Padres National Forest, United States Forest Service

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

51

**EXHIBIT "3"**
**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Colantuono, Highsmith & Whatley, PC**
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

# EXHIBIT "4"

**EXHIBIT "4"**
**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1



*OFFICE OF THE MAYOR*

*Betsy Stix*

*401 S. Ventura Street, Ojai, CA 93023*

October 13, 2021

Senator Monique Limon
State Capitol, Room 3092
Sacramento, CA 95814

RE: Opposition to the Mt. Pinos Logging Proposal

Dear Senator Limon,

The City of Ojai City Council opposes the logging of Mt. Pinos. While the logging will occur outside of Ojai city limits, Mt. Pinos is a special place for many Ojai residents. Many Ojai residents visit the area for hiking, family camping, birdwatching, and photography, and have a very close personal connection with the place.

In addition, Mt. Pinos provides a direct economic benefit to businesses in Ojai, as people who come to the area from throughout southern California stop in Ojai for food, gas, equipment, and lodging on their way to Mt. Pinos.

The City of Ojai opposes the logging proposal of Mt. Pinos and asks that the agency reconsider plans to remove a substantial number of trees and shrubs from 1,600 acres of habitat. Mt. Pinos is an important Chumash site in the Los Padres National Forest that lies at the physical and spiritual center of local Indigenous Tribes. The area is also popular for recreation and is home to several sensitive plants and animals.

We understand that the Forest Services has proposed this harvest as a form of community wildfire protection. However, several scientific studies have demonstrated that remote vegetation treatments are ineffective in protecting communities from fires that occur during extreme weather – which are conditions that cause the majority of damage in California. The City of Ojai would recommend promoting defensible space requirements near homes, rather than logging special and invaluable old growth forests of Mt. Pinos and Pine Mountain.

On October 12, 2021, at the City of Ojai City Council meeting, the City Council unanimously voted to support the opposition to the Mt. Pinos and Pine Mountain logging projects.

Thank you.

Sincerely,

*Betsy Stix*

Betsy Stix
Mayor, City of Ojai

cc: Supervisor Kevin Elliot, Los Padres National Forest, United States Forest Service

**EXHIBIT "4"**
**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Colantuono, Highsmith & Whatley, PC**
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

# EXHIBIT "5"

EXHIBIT "5"
**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1



*OFFICE OF THE MAYOR*

***Betsy Stix***

*401 S. Ventura Street, Ojai, CA 93023*

October 13, 2021

Congresswoman Julia Brownley
2262 Rayburn House Office Building
Washington, D.C. 20515

RE: Opposition to the Mt. Pinos Logging Proposal

Dear Congresswoman Brownley,

The City of Ojai City Council opposes the logging of Mt. Pinos. While the logging will occur outside of Ojai city limits, Mt. Pinos is a special place for many Ojai residents. Many Ojai residents visit the area for hiking, family camping, birdwatching, and photography, and have a very close personal connection with the place.

In addition, Mt. Pinos provides a direct economic benefit to businesses in Ojai, as people who come to the area from throughout southern California stop in Ojai for food, gas, equipment, and lodging on their way to Mt. Pinos.

The City of Ojai opposes the logging proposal of Mt. Pinos and asks that the agency reconsider plans to remove a substantial number of trees and shrubs from 1,600 acres of habitat. Mt. Pinos is an important Chumash site in the Los Padres National Forest that lies at the physical and spiritual center of local Indigenous Tribes. The area is also popular for recreation and is home to several sensitive plants and animals.

We understand that the Forest Services has proposed this harvest as a form of community wildfire protection. However, several scientific studies have demonstrated that remote vegetation treatments are ineffective in protecting communities from fires that occur during extreme weather – which are conditions that cause the majority of damage in California. The City of Ojai would recommend promoting defensible space requirements near homes, rather than logging special and invaluable old growth forests of Mt. Pinos and Pine Mountain.

On October 12, 2021, at the City of Ojai City Council meeting, the City Council unanimously voted to support the opposition to the Mt. Pinos and Pine Mountain logging projects.

Thank you.

Sincerely,

*Betsy Stix*

Betsy Stix
Mayor, City of Ojai

cc: Supervisor Kevin Elliot, Los Padres National Forest, United States Forest Service

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

EXHIBIT "5"
CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

281253.v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Colantuono, Highsmith & Whatley, PC**
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

# EXHIBIT "6"

**EXHIBIT "6"**
**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Colantuono, Highsmith & Whatley, PC
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109



**OFFICE OF THE MAYOR**

**Betsy Stix**

*401 S. Ventura Street, Ojai, CA 93023*

October 13, 2021

Senator Dianne Feinstein
331 Hart Senate Office Building
Washington, D.C. 20510

RE: Opposition to the Mt. Pinos Logging Proposal

Dear Senator Feinstein,

The City of Ojai City Council opposes the logging of Mt. Pinos. While the logging will occur outside of Ojai city limits, Mt. Pinos is a special place for many Ojai residents. Many Ojai residents visit the area for hiking, family camping, birdwatching, and photography, and have a very close personal connection with the place.

In addition, Mt. Pinos provides a direct economic benefit to businesses in Ojai, as people who come to the area from throughout southern California stop in Ojai for food, gas, equipment, and lodging on their way to Mt. Pinos.

The City of Ojai opposes the logging proposal of Mt. Pinos and asks that the agency reconsider plans to remove a substantial number of trees and shrubs from 1,600 acres of habitat. Mt. Pinos is an important Chumash site in the Los Padres National Forest that lies at the physical and spiritual center of local Indigenous Tribes. The area is also popular for recreation and is home to several sensitive plants and animals.

We understand that the Forest Services has proposed this harvest as a form of community wildfire protection. However, several scientific studies have demonstrated that remote vegetation treatments are ineffective in protecting communities from fires that occur during extreme weather – which are conditions that cause the majority of damage in California. The City of Ojai would recommend promoting defensible space requirements near homes, rather than logging special and invaluable old growth forests of Mt. Pinos and Pine Mountain.

On October 12, 2021, at the City of Ojai City Council meeting, the City Council unanimously voted to support the opposition to the Mt. Pinos and Pine Mountain logging projects.

Thank you.

Sincerely,

Betsy Stix

Betsy Stix
Mayor, City of Ojai

cc: Supervisor Kevin Elliot, Los Padres National Forest, United States Forest Service

**EXHIBIT "6"**
**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Colantuono, Highsmith & Whatley, PC**
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109

# EXHIBIT "7"

**EXHIBIT "7"**
**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1



**OFFICE OF THE MAYOR**

**Betsy Stix**

*401 S. Ventura Street, Ojai, CA 93023*

October 13, 2021

Senator Alex Padilla
112 Hart Senate Office Building
Washington, D.C. 20510

RE: Opposition to the Mt. Pinos Logging Proposal

Dear Senator Padilla,

The City of Ojai City Council opposes the logging of Mt. Pinos. While the logging will occur outside of Ojai city limits, Mt. Pinos is a special place for many Ojai residents. Many Ojai residents visit the area for hiking, family camping, birdwatching, and photography, and have a very close personal connection with the place.

In addition, Mt. Pinos provides a direct economic benefit to businesses in Ojai, as people who come to the area from throughout southern California stop in Ojai for food, gas, equipment, and lodging on their way to Mt. Pinos.

The City of Ojai opposes the logging proposal of Mt. Pinos and asks that the agency reconsider plans to remove a substantial number of trees and shrubs from 1,600 acres of habitat. Mt. Pinos is an important Chumash site in the Los Padres National Forest that lies at the physical and spiritual center of local Indigenous Tribes. The area is also popular for recreation and is home to several sensitive plants and animals.

We understand that the Forest Services has proposed this harvest as a form of community wildfire protection. However, several scientific studies have demonstrated that remote vegetation treatments are ineffective in protecting communities from fires that occur during extreme weather – which are conditions that cause the majority of damage in California. The City of Ojai would recommend promoting defensible space requirements near homes, rather than logging special and invaluable old growth forests of Mt. Pinos and Pine Mountain.

On October 12, 2021, at the City of Ojai City Council meeting, the City Council unanimously voted to support the opposition to the Mt. Pinos and Pine Mountain logging projects.

Thank you.

Sincerely,

*Betsy Stix*

Betsy Stix
Mayor, City of Ojai

cc: Supervisor Kevin Elliot, Los Padres National Forest, United States Forest Service

**EXHIBIT "7"**
**CITY OF OJAI'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

281253.v1